**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JAY ROSSI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19-cv-01417 |
| | ) |
| GENERAL NUTRITION | ) Judge Mannish Shah |
| CORPORATION and GRENADE® | ) |
| USA, LLC, | ) |
| | ) |
| Defendants. | ) **Jury demanded** |
| | ) |
| | ) |

**FIRST AMENDED COMPLAINT**

Plaintiff JAY ROSSI ("Plaintiff" or "Rossi"), by and through this attorney, James C. Vlahakis of Sulaiman Law Group, Ltd., brings this First Amended Complaint against Defendants GENERAL NUTRITION CORPORATION and GRENADE® USA, LLC:

### I.   Introduction

1. Defendant GENERAL NUTRITION CORPORATION ("GNC"), in combination with its parent and/or holding company, GNC HOLDINGS, INC. ("GNCH"), is the world's largest dietary supplement retailer.

2. Throughout the United States, including in the State of Illinois GNC advertises, promotes, markets, sells, and distributes dietary supplements manufactured by third-parties.

3. GRENADE® USA, LLC ("Grenade USA") manufactured and/or manufactured a dietary supplement product called GRENADE - THERMO DETONATOR® ("GTD").

4. Through on-line sales and point-of-purchase (store-based) sales, GNC sold GTD to the public, including consumers in the State of Illinois during the two years preceding the filing of this civil action.

5.     For all times relevant to the events described below, Plaintiff Jay Rossi ("Rossi" or "Plaintiff") resided in the State of Illinois and was (and still is) a citizen of the State of Illinois.

6.     In or around late September 2017 or early October 2017, while Rossi was living in the State of Illinois, he purchased a bottle of GTD at the GNC store in Mount Prospect, Illinois.

7.     To the best of Rossi's knowledge, information and belief, the bottle of GTD that he purchased contained amphetamines or an amphetamine type product.

8.     Rossi brings this action against Defendants because the bottle of GTD that he purchased almost killed him because the contents of his purchased bottle of GTD was laced with amphetamines or an amphetamine type substance.

9.     Rossi was hospitalized in a Chicagoland hospital for five days because he ingested and utilized contaminated GTD.[1]

10.     To the best of Rossi's present knowledge, information and belief, the bottle of GTD that he purchased almost killed him as a result of it containing dangerous levels of Yohimbe Bark Extract.

11.     Alternatively, to the best of Rossi's present knowledge, information and belief, the bottle of GTD that he purchased almost killed him as a result of it containing dangerous levels of Bitter Orange extract, Synephrine and/or Octopamine.

12.     After Rossi recovered from his near death experience, he returned to the store where he purchased the bottle of GTD to alert the GNC that the bottle of GTD that he purchased had almost killed him.

13.     When Rossi returned to the GNC store in question, he spoke with a male employee

---

[1] As detailed below, independent testing which was conducted after Plaintiff was hospitalized supports Plaintiff's contention that the GTD product he ingested contained amphetamines or an amphetamine-like substance.

and asked to speak with the store's manager.

14.    The employee responded to Rossi's request by telling him that the manager had gone off for the day.

15.    In response, Rossi told the employee that he had been hospitalized for five days after ingesting a recommended dosage of GTD.  Rossi also told the employee that he had stopped breathing and had hallucinated after ingesting GTD.

16.    Rossi also told the employee that a drug test revealed the presence of amphetamines and denied that he knowingly took amphetamines.

17.    The employee in question told Rossi that he was going to call the GNC store manager and immediately after saying this, the employed dialed in Ross's presence and spoke with another person who answer the employee's phone call.

18.    During the employee's conversation with the presumed GNC store manager, Rossi heard the employee use a three-letter code "AER" to describe the nature of Rossi's verbal complaint.

19.    AER stands for "Adverse Event Return", meaning a documented return of a produce to a GNC store where the produce resulted in an adverse event with regard to the person returning the produce.

20.    After the employee concluded his conversation with presumed GNC store manager, the employee asked for Plaintiff's name and typed it into the store's computer.

21.    Thereafter, the employee called GNC and/or GNCH's corporate offices.

22.    When none answered the employee's phone call, the employee told Rossi that he thought that everyone had left the corporate office for the day.

23.    The employee asked Rossi for his telephone number and told Rossi that "someone

will call you from corporate."

24.     The employee instructed Rossi to "let them know everything" or similar words.

25.     Because of his near death experience, Rossi was concerned that other consumers were at risk of summary similar injuries.  In an effort to help GNC prevent a similar episode to the one he suffered, Rossi decided to leave his GTD bottle (which contained some of the remaining GTD product) with the hope that the employee would preserve the sample for future testing.

26.     Rossi left his GTD bottle in the custody of the employee.

27.     Despite the fact that the employee in question took down Plaintiff's name and telephone number, no one associated with GNC has ever contacted Rossi.

28.     Even before Rossi had told the employee about his near death experience from consuming GTD, GNC was aware of another consumer who had complained that he a health issue after ingesting GTD.

29.     The below screen shot taken from GNC's website identifies a consumer named "Walter" complaining about GTD and "Response form GNC" by "Staff" named  "John T":



30.     As reflected above, Walter's complaint stated that "I took Grenade for the first time and my heartbeat increased to 152 [bpm] for 6 hours!"

31.     Walter's post also says "I was dizzy and jittery and unable to do anything that would increase my heart rate."

32.     Walter's post also stated "I feared my heart would explode like the packaging suggest[s], like a grenade."

33.     As discussed below, GNC sold, advertised and/or otherwise placed GTD into the stream of commerce on the internet and/or at GNC stores despite knowing that GTD contained a harmful and dangerous amphetamine-like substance.

34.     Alternatively, GNC failed to take reasonable measures to discover that GTD contained a harmful and dangerous amphetamine-like substance.

35.     Grenade USA manufactured, packaged, sold, advertised and/or otherwise placed GTD into the stream of commerce on the internet and at GNC stores despite knowing that GTD contained a harmful and dangerous amphetamine-like substance.

36.     Plaintiff almost died in November 2017, because his bottle of GTD being laced or comprised of an amphetamine-like substance.

37.     GNC continued to sell GTD to the public even after Plaintiff went to his point of purchase and complained that he his consumption of GTD caused him to be hospitalized.

38.     On information and belief, GNC and GNC's employee took no effort to ensure that the GTD Plaintiff consumed was tested for any harmful substances.

39.     Alternatively, on information and belief, GNC obtained the remaining contents of the GTD bottle that Plaintiff returned to his point of purchase, analyzed the contents, and learned that the ingredients were laced with a harmful, amphetamine like substance.

40. As set forth below, GNC and Grenade USA should have never sold GTD to the public because GTD is dangerous and life-threatening to consumers because GTD contains unhealthy ingredients, including, but not limited to, an amphetamine-like substance or substances.

## II. Parties, Jurisdiction and Venue

41. Plaintiff Rossi was injured in the State of Illinois and was a Citizen of the State of Illinois at the time he sustained injuries as a result of consuming GTD.

42. GNC describes itself as a leading global retailer of health and wellness products, including vitamins, minerals, dietary supplement products, sports nutrition products, and diet products.

43. GNC is a merchant in the trade of food supplements.

44. GNC sells substantial amounts of health and wellness products, including nutritional supplement products.

45. GNC claims on its website that "GNC sets the standard in the nutritional supplement industry."[2]

46. GNC is incorporated under the laws of Pennsylvania.

47. GNC's principal place of business is located in Pittsburgh, Pennsylvania.

48. Grenade USA advertised and distributed GTD in the United States prior to and after Plaintiff purchased a bottle of GTD.

49. GTD is packaged, advertised, and distributed by Grenade USA.

50. According to the State of Rhode Island and Providence Plantations Office of the Secretary of State's website, Grenade USA is registered as a Foreign Limited Liability Company organized under the laws of Delaware, Identification Number 001329856.

---

[2] http://www.gnc.com/about-us.html

51.     According to the State of Rhode Island and Providence Plantations Office of the Secretary of State's website, Grenade USA's principal office and mailing address are both listed at 815 Reservoir Ave, Ste. 1A Cranston, Rhode Island, 02910.

52.     Grenade USA's website lists a mailing address of 815 Reservoir Ave, Ste. 1A, Cranston, Rhode Island 02910.

53.     Grenade USA is a Delaware registered limited liability company, and identifies with File Number 603261.

54.     Grenade USA's registered agent is listed as Sundoc Filings, 3500 S. Dupont Highway, Dover, Delaware 19901 on the State of Delaware's Department of State: Division of Corporations. Alternatively, Grenade USA's registered agent, Sundoc, is listed with an address of 874 Walker Road, Suite C, Dover, DE 19904.

55.     Grenade USA was served with the original Complaint by and through Sundoc Filings at 874 Walker Road, Suite C, Dover, DE 19904.

56.     Despite being served, Grenade USA did not answer the operative Comlaint.

57.     According to the State of Rhode Island and Providence Plantations Office of the Secretary of State's website, Gregg Alan-Madsen, was listed as Grenade USA's registered agent with an address of 7 Penny Lane, Cranston, Rhode Island 02921.

58.     Gregg Madsen's LinkedIn profile listed himself as a Director of U.S. Operations at Grenade USA, LLC, between January 2013 and October 2018.

59.     Grenade USA's legal department is listed on its website as having a mailing address at 225 Episcopal Road, Berlin, Connecticut 06037, United States.

60.     The claims described in this Complaint arise from GNC's sale of GTD in Illinois and throughout the United States as well as the advertising, packaging and distribution of GTD in

the United States by Grenade USA.

61.     Plaintiff does not currently reside in the State of Illinois.[3]  Plaintiff, however, considers himself a citizen of the State of Illinois.[4]

62.     This Court has diversity jurisdiction because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332 (a)

63.     GNC and Grenade regularly conducts business in this District, including sales to other consumers, and a substantial part of the acts or omissions giving rise to the claims occurred within this District.

64.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

### III.    Background Facts Related to the Advertising and Promotion of GTD

65.     Grenade USA's website (https://www.grenade.com/us/store) describes itself as:

> Grenade® is the go-to brand in the active nutrition/healthy snacking space. With its full range of high protein, low sugar offerings, Grenade® leads the way with a range of great tasting, healthy snacking products.

66.     A true and accurate screen capture of Grenade USA's website, https://www.grenade.com/us/thermo-detonator, from May 22, 2019, appears below:

---

[3] "Citizenship depends not on residence but on domicile, which means the place where a person intends to live in the long run." *RTP LLC v. ORIX Real Estate Capital, Inc*., 827 F.3d 689, 692 (7th Cir. 2016).  "For purposes of the diversity jurisdiction, citizenship differs from residence. Citizenship means domicile (the person's long-term plan for a state of habitation) rather than just current residence." *Myrick v. WellPoint, Inc.*, 764 F.3d 662, 664 (7th Cir. 2014). "[R]esidence may or may not demonstrate citizenship, which depends on domicile—that is to say, the state in which a person intends to live over the long run." *Heinen v. Northrop Grumman Corp*., 671 F.3d 669, 670 (7th Cir. 2012).

[4] Citizenship thus has a "mental dimension." *Strabala v. Zhang*, 318 F.R.D. 81, 97 (N.D. Ill. 2016) (citation omitted).  "[D]omicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there."  *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).



67.    A true and accurate screen capture of Grenade USA's website's description of the

"KEY BENEFITS" of GTD from May 22, 2019, appears below:



68.    The following a verbatim excerpt of Grenade USA's "The Grenade® Story":

The Grenade® story is one of roll-your-sleeves-up hard work and a commitment
to doing things better. Founded in 2009, our mission was simple. As sports
supplement distributors we'd grown tired of selling a bunch of stuff that looked
and sounded the same. So we set about creating products that people would
actively seek out and remember.

Our first attempt at a weight loss formula was so effective a friend described the

results as explosive, 'like a grenade'. That product became Thermo Detonator® and Grenade® became the name we were looking for. Over the following years our team grew alongside a product family bursting with personality (and great-tasting, high-quality ingredients).

*See*, https://www.grenade.com/us/about-us

69. A true and accurate screen capture of Grenade USA's website "Grenade® Story" was captured on May 22, 2019, and is depicted below:



70. On May 22, 2019, and in all of 2018, Grenade USA's website identifies GTD as containing the following "NUTRITIONAL AND INGREDIENTS" and percentage of "Daily Value" ("DV"):

**NUTRITIONAL INFORMATION**

| AMOUNT PER SERVING | DV** |
|---|---|
| GRENADE® Thermo Detonator Proprietary Blend | 775 mg** |
| Green Tea Extract (80% polyphenols, epigallocatechin gallate, 45% epicatechin), | ** |

| | |
|---|---|
| Bitter Orange Extract (synephrine, octopamine, N-methyltyramine, tyramine, hordenine) | ** |
| Caffeine Anhydrous (1,3,7-trimethylxanthine) | ** |
| Grapefruit Seed Extract (6,7-dihydroxybergamottin) | ** |
| Capsicum Annuum (capsaicin fruit) | ** |
| Evodiamine (evodia fructus extract) | ** |
| Yohimbe Bark Extract (yohimbine) | ** |
| Raspberry Ketones [4-(4-hydroxyphenyl) butan-2-one] | ** |
| Phenylalanine (2-amino-3-phenylpropanoic acid), | ** |
| Cocoa Bean Extract (methylxanthines, flavanols) | ** |
| β-pheneythylamine HCl (B-PEA) | ** |
| Coleus Forskohlii (forskolin root) | ** |
| Yerba Mate Leaf (caffeine, theobromine and theophylline) | ** |
| DMAE Bitartrate | ** |

**Daily Value (DV) Not established

71. On May 2019, and in all of 2018, Grenade USA's website listed the following "Other Ingredients" as follows:

**INGREDIENTS**
Other Ingredients: Gelatin, magnesium stearate, chlorophyllin copper complex sodium, titanium dioxide, FD&C yellow #6, Blue #1, Red #40

72. GTD is manufactured and sold in the United Kingdom without the ingredient Bitter Orange Extract.

73. GNC sells and promotes GTD at https://www.gnc.com/thermogenics/522801.html

74. The below is an accurate screen capture captured on May 22, 2019, from GNC's website https://www.gnc.com/thermogenics/522801.html



75. On May 22, 2019, GNC's website, https://www.gnc.com/on/demandware.static/-/Sites-GNC-Library/default/v1558515811183/pdf/522801_lbl.pdf, hosted the following image which depicts and/or depicted certain GTD:



76.     The below image is a true and accurate close-up image of the above depicted packaging hosted on GNC's above noted website identifies "Supplement Facts" is depicted below:



77.     The below image is a true and accurate close-up image of the above depicted on GNC's above noted website identifies a "WARNING":



78. On May 22, 2019, GNC's website at hosted the following review of GTD at

https://www.gnc.com/thermogenics/522801.html:



79. The below images depict certain advertising utilized by Grenade USA to explain

"WHAT INGREDIENTS POWER GRENADE AND HOW DO THEY WORK?":



# WHAT INGREDIENTS POWER GRENADE AND HOW DO THEY WORK?

## Green Tea Extract
### (80% polyphenols, 45% epigallocatechin gallate, epicatechin)
Green tea, despite its modest name, contains certain active polyphenols that have been scientifically-demonstrated to have significant physiological effects, including fat loss, performance support and antioxidant effects.* Of particular interest is the catechin compound "epigallocatechin gallate", which has been extensively investigated in several scientific studies and may be an important, natural molecule in the war on fat!* The specific green tea material used in Grenade® Thermo Detonator has been manufactured to optimize levels of this compound.*

## Bitter Orange Extract
### (synephrine, octopamine, N-methyltyramine, tyramine, hordenine)
This ingredient is another custom-processed extract also known as citrus aurantium. Its principal active extract is synephrine, which is a sypathomimetic, meaning that it stimulates the hormones involved in mobilizing and oxidizing (burning) energy and it has been specifically suggested to enhance lipolysis (fat breakdown).* N-methyltyramine and tyramine have the ability to release catecholamines, which are the most powerful fat burning hormones in the human body. Octopamine is the N-methylated analogue of synephrine and it also has the ability to stimulate fat breakdown.*

## Caffeine Anhydrous
### (1,3,7 - trimethylxanthine)
Caffeine Anhydrous is a xanthine alkaloid that is well known in the scientific literature to mobilize fat from fatty tissue and to increase physical performance and mental focus.

## Grapefruit Seed Extract
### (6,7 - dihydroxybergamottin)
The extract of grapefruit seed, dihydroxybergamottin, is known to prolong the effects of various compounds involved in the fat-burning process.

## Capsicum Annuum
### (capsaicin)
Prominent weight loss scientists have investigated the considerable research on capsaicin-containing natural ingredients and suggest that they can both increase energy expenditure and fat oxidation (fat burning) so as to decrease the energy balance equation.* This would of course be expected to reduce body fat levels.*

## Evodiamine
### (evodia fructus extract)
The scientific literature describes evodia fruit as a "hot nature" herb. Evodiamine is currently undergoing intensive investigation for its "thermogenic", appetite-suppressing and weight loss effects that have already been suggested in the rodent model.* These effects suggest increased fat and calorie burning along with decreased food cravings.*



intensive investigation for its "thermogenic", appetite-suppressing and weight loss effects that have already been suggested in the rodent model.* These effects suggest increased fat and calorie burning along with decreased food cravings.*

**Yohimbe Bark Extract**
(yohimbine)
Traditionally used to support sexual health, yohimbine is suggested to increase the mobilization of fat and the secretion of fat-metabolising hormones in healthy men.* Yohimbine appears to deliver its effects via blockade of the alpha-2 adrenoreceptor, which prolongs the metabolism of norepinephrine – one of the body's most powerful fat-burning hormone.*

**Raspberry Ketones**
[4-(4-hydroxyphenyl) butan11px-one]
Raspberry ketones work much like capsaicin and evodia and they are also being studied for their ability to resist fat gains in rodents fed high-fat diets.*

**Phenylalanine**
(2-amino-3-phenylpropanoic acid)
This amino acid may help to elevate levels of the appetite-suppressing hormone cholecystokinin (a.k.a. CCK) and may promote better mood and attention levels.*

**Cocoa Bean Extract**
(methylxanthines, flavanols)
In addition to supporting good blood flow and its antioxidant effects, it has been suggested that cocoa flavanols may support parameters associated with insulin function and healthy body composition.*

**B-phenethylamine HCl**
(B-PEA)
Phenethylamine is directly involved in the release of not only norepinephrine (which has already been discussed for its fat-burning effects) but also dopamine. Higher dopamine levels may support mood and concentration.*

**Coleus Forskohlii**
(forskolin)
Forskolin has a direct influence on adenylate cyclase, this enzyme activates a second messenger called cAMP, which promotes the breakdown of fat in fat cells. This has been demonstrated in both humans and animals. It has also been suggested to reduce body fat gains in adult humans.*

**Yerba Mate Leaf**
(caffeine, theobromine and theophylline)
This is a favourite energy drink of many South Americans who consume it much like coffee. It has naturally high levels of xanthine stimulants that may increase metabolic rate and have other common stimulant effects.

**DMAE**
(dimethylaminoethanol)
This organic molecule is best known for its effects on alertness and mood and it may fuel neurotransmitter production in the body.*

GET $10

80. The below screen image of earlier packaging of GTD was used by Grenade USA to promote and advertise the following so-called "Scientific References":



81. The below screen image depicts one form of packaging utilized by Grenade USA to promote and advertise the following so-called "Scientific References":



82.    The above screen capture was obtained from www.bodybuilding.com on June 13, 2018. The other images were found at https://www.bodybuilding.com/store/grenade/thermo-detonator.html The below screen capture was taken from the website www.bodybuilding.com and identifies ingredients from an earlier version of GTD:



## IV.    Additional Background Facts

### A.  *GNC's Review and Testing of Third-Party Products*

83.    As detailed below, GNC reviews and pre-approves all labels, packaging, advertising, and marketing materials for third-party products sold in its stores.

84.    GNC works closely with third-party vendors to ensure that labeling and marketing materials comply with GNC's requirements and expectations.

85.    GNC also reviews the scientific literature on many of the ingredients used in third-party products.

86.    Accordingly, on information and belief, GNC reviewed, tested and otherwise examined the contents and claims of GTD before GNC sold GTD at its store and website.

87.    GNC has represented on its website that "GNC sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency, all while remaining on the cutting-edge of nutritional science."[5]

88.    "GNC requires its vendors to be honest, ethical, reliable and capable of providing products that meet our high standards of quality."[6]

89.    As described below, GNC obtained and sold products obtained from third-party vendors that they knew or should have known contain unlawful and potentially unsafe ingredients.

90.    As described below, in the past GNC has failed to ascertain whether third-party products contained unlawful and potentially unsafe ingredients before the products were sold by GNC.

---

[5] http://www.gnc.com/about-us.html

[6] http://www.gnc.com/vendor-relations.html

91.    As described below, GNC has sold third-party products that they knew, or should have known, were labeled in a negligent or false manner. This history of inaction, negligence or inappropriate review and analysis of third-party products has led to the harm suffered by Plaintiff. Simply stated, GNC does not adequately review and analyze third-party products to confirm if the products and their ingredients are safe for human consumption

92.    For example, on December 8, 2014, GNC's Senior Project Manager for Technical Research and GNC's Associate Project Manager discussed the scientific literature "regarding ingredients from 3rd party products" during an exchange that these individuals had regarding vitamins and supplements manufactured by an entity known as Nutra Manufacturing.

93.    On information and belief, Nutra is an entity that was or still is affiliated with GNC and/or GNCH.

### B. The United States DOJ Has Investigated GNC and GNCH's Conduct

94.    In December of 2016, GNCH "entered into a wide-ranging agreement with the Department of Justice to reform its practices related to potentially unlawful dietary ingredients and dietary supplements, and has further promised to embark on a series of voluntary initiatives designed to improve the quality and purity of dietary supplements[.]"

95.    The U.S. Department of Justice ("DOJ") Press Release of December 7, 2016, can be found at https://www.justice.gov/opa/pr/gnc-enters-agreement-department-justice-improve-its-practices-and-keep-potentially-illegal

96.    The non-prosecution agreement was the result of a "lengthy investigation conducted by the U.S. Food and Drug Administration (FDA), the U.S. Attorney's Office for the Northern District of Texas, and the Consumer Protection Branch of the Department of Justice's Civil Division[.]" *Id.*

97. According to the DOJ, the joint investigation "revealed that GNC[H]'s practices related to ensuring the legality of products on its shelves were lacking." *Id.*

98. The DOJ summarized GNCH's conduct as follows:

> According to an agreed-upon statement of facts that accompanies the non-prosecution agreement, GNC engaged in acts and omissions that allowed a misbranded supplement— OxyElite Pro Advanced Formula, a product of Dallas-based USPlabs LLC (USP Labs)—to be sold at GNC locations nationwide in 2013. The statement of facts notes that GNC sold the product based on representations from USP Labs that ingredients contained in the product complied with the law. It further notes that GNC did not undertake additional testing or require additional certifications to confirm such representations or to verify that the ingredients in the product were as represented. *Id.*

99. The DOJ's press release describing the non-prosecution agreement, explained that its "resolution" with GNCH "is a significant step forward in reforming an industry rife with alarming practices."

100. In describing what the DOJ termed "an industry rife with alarming practices", the DOJ's press release stated that "Companies like GNC[H] need to do more to ensure that they are not selling products containing questionable and untested ingredients. The American public deserves better[.]"

101. In the DOJ's press release, U.S. Attorney John R. Parker of the Northern District of Texas said: "those engaged in the sale of dietary supplements to the public must adhere to higher standards to ensure consumers are protected from lax business practices that could endanger them."

102. "As part of the [non-prosecution] agreement, GNC[H] has agreed to pay $2.25 million to the U.S. government and cooperate in dietary supplement investigations conducted by the government." *Id.* Further, as part of the non-prosecution agreement with the DOJ, GNC promised to embark on a series of voluntary initiatives designed to improve the quality and purity of it dietary supplements.

103. Excerpts of DOJ's December 7, 2016, press release are quoted below:

GNC Enters Into Agreement with Department of Justice to Improve its Practices and Keep Potentially Illegal Dietary Supplements Out of the Marketplace

The world's largest dietary supplement retailer, GNC Holdings Inc. (GNC), has entered into a wide-ranging agreement with the Department of Justice to reform its practices related to potentially unlawful dietary ingredients and dietary supplements, and has further promised to embark on a series of voluntary initiatives designed to improve the quality and purity of dietary supplements, the Department of Justice announced today. The non-prosecution agreement resolves GNC's liability for selling certain dietary supplements produced by a firm currently under indictment. As part of the agreement, GNC has agreed to pay $2.25 million to the U.S. government and cooperate in dietary supplement investigations conducted by the government.

A lengthy investigation conducted by the U.S. Food and Drug Administration (FDA), the U.S. Attorney's Office for the Northern District of Texas, and the Consumer Protection Branch of the Department of Justice's Civil Division revealed that GNC's practices related to ensuring the legality of products on its shelves were lacking.

According to an agreed-upon statement of facts that accompanies the non-prosecution agreement, GNC engaged in acts and omissions that allowed a misbranded supplement— OxyElite Pro Advanced Formula, a product of Dallas-based USPlabs LLC (USP Labs)—to be sold at GNC locations nationwide in 2013. The statement of facts notes that GNC sold the product based on representations from USP Labs that ingredients contained in the product complied with the law. It further notes that GNC did not undertake additional testing or require additional certifications to confirm such representations or to verify that the ingredients in the product were as represented.

USP Labs was indicted in November 2015 and is awaiting trial. The indictment alleges, among other things, that USP Labs engaged in a conspiracy to import ingredients from China using false certificates of analysis and false labeling, and then lied about the source and nature of those ingredients after it put them in its products. According to the indictment, USP Labs told some of its retailers and wholesalers that it used natural plant extracts in some of its products, when in fact it was using synthetic stimulants manufactured in a Chinese chemical factory.

Today's resolution requires GNC to commit to certain changes designed to prevent unlawful dietary supplements from reaching its shelves:

First, GNC has agreed that, upon learning that the FDA has issued a public written notice indicating that a purported dietary supplement or an ingredient contained in a purported dietary supplement is not legal and/or not safe, GNC will take immediate action to suspend the sale of such a product or products.

Second, GNC will establish two lists—a "restricted list" containing ingredients that are not to be used in dietary supplements and a "positive list" containing ingredients that are approved for sale. Although GNC has agreed that the lists it creates will not have the force of law, GNC will use these lists to guide the company in determining what products it will approve for sale. Products containing novel ingredients that do not appear on either list will, GNC agreed, require further internal action and approval before being offered for sale.

Third, GNC will substantially revise its internal approach to dealing with the vendors whose products GNC sells, including requiring more explicit guarantees from its vendors that their products do not contain ingredients on the "restricted list" and that their products comply with federal law.

Fourth, GNC will voluntarily work to develop an industry-wide quality seal program. When this quality seal is implemented, GNC has agreed to stop paying its retail salespeople bonus commissions, or "promotional money," to direct customers to products in its stores not carrying the seal.

Finally, GNC will update its adverse event reporting policy to ensure that its employees understand the proper procedures to employ if a customer complains of injuries associated with a dietary supplement bought at GNC.

104. GNC's Form 10K report for the fiscal year ending on December 31, 2017, GNC

described the events leading up to the DOJ's non-prosecution agreement as follows:

**Government Regulation**
In November 2013, the Company received a subpoena from the U.S. Department of Justice ("DOJ") for information related to its investigation of a third party product vendor, USPlabs, LLC. The Company fully cooperated with the investigation of the vendor and the related products, all of which were discontinued in 2013. In December 2016, the Company reached agreement with the DOJ in connection with the Company's cooperation, which agreement acknowledges the Company relied on the representations and written guarantees of USPlabs and the Company's representation that it did not knowingly sell products not in compliance with the FDCA. Under the agreement, which includes an immaterial payment to the federal government, the Company will take a number of actions to broaden industry-wide knowledge of prohibited ingredients and improve compliance by vendors of third party products. These actions are in keeping with the leadership role the Company has taken in setting industry quality and compliance standards, and the Company's commitment over the course of the agreement (60 months) to support a combination of its and the industry's initiatives. Some of these actions include maintaining and continuously updating a list of restricted ingredients that will be prohibited from inclusion in any products that are sold by the Company. Vendors selling products to the Company for the sale of such products by the Company will be required to warrant that the products sold do not contain any of these restricted ingredients. In addition, the Company will develop and maintain a list of ingredients that the Company believes comply with the applicable provisions of the FDCA.

### C. GNC's Other Acts of Misconduct Regarding Harmful Supplements

#### i.    GNC's Sale of Products Containing BMPEA

105.    In 2015 and 2016, GNC was subject to a federal investigation regarding its sale of products that contained or BMPEA.

106.    GNC has sold products that it knew or should have known had been formulated of compunded with BMPEA, without disclosing on the product's label that the product contained this unhealthy and unlawful ingredient.

#### ii.    GNC's Sale of Products Containing DMAA

107.    In or around 2013, GNC sold products manufactured by third parties that contained derivatives from geranium known as 1.3-dimethylpentylamine/ dimethylamylamine/ 13-dimethylamylamine, or "DMAA" and and/or Aegeline, a compound extracted from bael trees.

108.    Products containing DMAA and/or Aegeline were recalled from GNC stores in or around November 2013.

109.    GNC has been named in at least thirty-two personal injury lawsuits involving products containing DMAA and/or Aegeline.

110.    According to GNC's Form 10K report for the fiscal year ending on December 31, 2017, GNC says the following:

> **DMAA/Aegeline Claims.** Prior to December 2013, we sold products manufactured by third parties that contained derivatives from geranium known as 1.3-dimethylpentylamine/ dimethylamylamine/ 13-dimethylamylamine, or "DMAA," which were recalled from our stores in November 2013, and/or Aegeline, a compound extracted from bael trees. As of March 31, 2018 we were named in the following 29 personal injury lawsuits involving products containing DMAA and/or Aegeline.

#### iii.    GNC's Sale of Products Containing Picamilon

111.    Picamilon is another example of a synthetic drug that GNC failed to properly investigate and ban from any product that it has sold.

112. Picamilon was developed by researchers in the former Soviet Union and is currently a prescription drug in Russia used to treat a variety of neurological conditions.

113. Picamilon has never been approved as a prescription or over-the-counter drug in the United States by the FDA or any other relevant agency.

114. Picamilon is a neurotransmitter (gamma-aminobutyric acid or GABA) that has been synthetically modified in order to facilitate its translocation across the blood-brain barrier.

115. Picamilon is formed by synthetically combining nicotinic acid (niacin) with GABA. There is no literary or scientific indication that this compound is found in nature.

116. On information and belief, GNC obtained and sold products from third-party manufacturers that contained Picamilon at GNC stores and via GNC's website.

117. GNC, however, knew in May of 2007, that Picamilon is not a lawful dietary ingredient. At that time, GNC's Senior Project Manager for Technical Research Jennifer Jakel, whose responsibilities include insuring that labeling and scientific claims are accurate, reviewed the available literature regarding Picamilon.

118. All the documents reviewed by Ms. Jakel had been translated from Russian.

119. Among the documents reviewed by Ms. Jakel was a review of Picamilon, which among other things, describes Picamilon as among "a new class of medicinal preparations called nootropics which are finding increasingly wider applications in various areas of medicine."

120. Ms. Jakel also learned from this same document that Picamilon was "synthesized in 1969 by the All-Union Scientific Research Institute and studied in the NII pharmacological RAN." Ms. Jakel also described Picamilon "is a derivative of the gamma-amino-butyric acid and nicotinic acid." (underlined by Ms. Jakel).

121. Thus, as early as May 22, 2007, GNC knew that Picamilon was a synthetic drug

created by Soviet investigators and not a lawful dietary ingredient in the United States.

122. GNC also knew that Picamilon is not a lawful dietary ingredient because as part of her May 2007 review, Ms. Jakel documented in the GNC library file on Picamilon: "No NDI that I could find."

123. A "New Dietary Ingredient" ("NDI") notification is required by federal law before a dietary ingredient not used in the United States before 1994 may be used in a dietary supplement.

124. The NDI notification must be submitted 75 days before the ingredient is sold and must include information that supports the manufacturer's or distributor's belief that the product is safe.

125. Only if the FDA takes no action during the 75-day period may the NDI be used in dietary supplements sold in the United States.

126. In April 2014, Ms. Jakel again looked for an NDI notification for Picamilon and documented in her file "still no NDI found."

### iv. GNCH Was Investigated by the Attorney General for the State of Oregon

127. On June 16, 2015, the Attorney General for the State of Oregon issued an Investigative Demand to GNC Holdings, Inc.

128. The Investigative Demand sought production of documents and information relating to the GNC's sale of Picamilon. The Investigative Demand clearly discussed the likelihood that Picamilon was not a lawful dietary ingredient.

129. According to GNC's Form 10K report for the fiscal year ending on December 31, 2017, GNC says the following about the Investigative Demand:

> **Oregon Attorney General.** On October 22, 2015, the Attorney General for the State of Oregon sued GNC in Multnomah County Circuit Court for alleged violations of Oregon's Unlawful Trade Practices Act, in connection with its sale in Oregon of certain third-party products. The Company is vigorously defending itself against these

allegations. Along with its Amended Answer and Affirmative Defenses, the Company filed a counterclaim for declaratory relief, asking the court to make certain rulings in favor of the Company, and adding USPlabs, LLC and SK Laboratories as counterclaim defendants. In March 2018, the Oregon Attorney General filed a motion for summary judgment relating to its first claim for relief, which the Company is contesting. In April 2018, USPlabs, LLC filed a motion to stay the proceeding pending its criminal trial in the Northern District of Texas. Both motions are pending. The parties are in the process of exchanging discovery. The trial date is currently set for October 2018.

130. GNC was aware that GNCH was in receipt of the demand, and GNCH and/or GNC produced documents and information in response to the demand.

131. Despite this additional notice to the GNC and GNCH that Picamilon was an unlawful ingredient and that products that contain Picamilon are adulterated, GNC and/or GNCH continued to sell products that contain Picamilon nationally including sale in Illinois.

132. GNC did not cease selling such products until after Oregon's Attorney General issued a document entitled "Notice of Unlawful Trace Practices and Proposed Resolution" on September 21, 2015.

133. It was only after this document was served on the GNC and/or GNCH that GNC stopped selling products that contain Picamilon.

134. GNC knew of the FDA study as early as November 2, 2013, when Ms. Jakel was notified by a PubMed service that the study was available on line.

*v.*      ***GNC Learns of the Dangers of Acacia Rigidula***

135. On November 18, 2013, USA Today published an article about the FDA study of amphetamine-like substances. A hyperlink to the USA Today's article can be found at http://www.usatoday.com/story/news/nation/2013/11/18/fda-scientists-find-amphetime-like-compound-in-dietary-supplements/3627963/

136. The FDA study became widely known throughout GNC on November 19, 2013, when Ms. Jakel circulated the *USA Today* article to approximately 100 recipients at GNC's

headquarters.

137.    Among those recipients was GNC's Senior Vice President and Chief Innovation Officer Guru Ramanathan.

138.    GNC Vice President General Counsel, Regulator Affairs, David J. Sullivan, was another recipient of the *USA Today* article.

139.    Within minutes of receiving the email from Ms. Jakel, Merchandising Manager Carter Gray wrote to GNC Director of Merchandising John Telencho, "Please tell me we won't have to get rid of acacia now."

140.    Shortly after receiving the *USA Today* article, GNC Director of e-Commerce Nathanial Kennedy learned of six products sold by GNC with acacia rigidula ("AR").

141.    Later that day, Brian Cavanough, GNC's Senior Vice President of Merchandising wrote to Steve Cherry, the Vice President of Purchasing, and David J. Sullivan and offered to do a "database search to find all SKUs" associated with affected products.

142.    Despite widespread knowledge that the AR products sold by GNC were at high risk of having been spiked with BMPEA, including knowledge by Sullivan, GNC continued to sell products that contained AR without testing these products to determine whether the product was adulterated with BMPEA or informing consumers of the risk that these products were adulterated with harmful banned substances.

143.    GNC also continued to sell products that were labeled as containing BMPEA even though it knew or should have known from the 2013 FDA study that BMPEA is a synthetic substance similar to amphetamine and was not a lawful dietary ingredient.

144.    Also after the 2013 FDA study, GNC approved inclusion of AR in products supplied to GNC by a third-party vendor.

145.   For example, on February 21, 2014, supplier Riley Judd wrote to GNC employee Russell Barba that "Rhino Rush is currently reformulating the current ephedra version shot. To replace the ephedra, they would like to use Acacia Rigidula (leaves) – is this ingredient acceptable."

146.   On March 12, 2014, the Food Standards Agency of the European Union ("EU") contacted GNC and other sellers of AR products to inform them that Acacia Rigidula was a "novel food product" and could not be sold in the EU because, among other things, its safety had not been demonstrated.

147.   In November 2014, the newsletter *NutraIngredients-USA* reported that Danish and Swedish regulatory agencies had issued warnings that a dietary supplement labeled as containing Acacia Rigidula that was spiked with BMPEA may have caused a hemorrhagic stroke. This newsletter was widely distributed throughout GNC headquarters.

148.   In December 2014, Healthy Canadian (the Canadian equivalent to the FDA) announced a recall of the Acacia Rigidula labeled dietary supplement "Jet Fuel Superburn" because it was spiked with undisclosed BMPEA. At the time of the Healthy Canadian recall, GNC sold Jet Fuel Superburn and other dietary supplements labeled as containing AR and at risk of containing BMPEA, continued to sell those products in Oregon and the United States even after the Healthy Canadian recall.

149.   In April 2015, researchers reported the results of yet another study (the "Cohen Study") that found more than 50% of tested dietary supplements labeled as containing AR were spiked with BMPEA. *See,* Cohen *et al*., *An Amphetamine Isomer Whose Efficacy And Safety In Humans Has Never Been Studied β-methylphenethylaminine (BMPEA), Is Found In Multiple Dietary Supplements*, Drug Test Analysis DOI. 1002/dta 1793.

150.    The list of products tested in the Cohen Study that were found to contain undisclosed BMPEA included products GNC sold in the United States and Pennsylvania.

151.    The Cohen Study received significant national media attention. On April 23, 2015, after the results of the Cohen Study became widely known, the FDA formally announced that BMPEA does not meet the statutory definition of a dietary ingredient and sent warning letters to manufacturers whose products contain BMPEA.

152.    It was only after the FDA made its formal announcement that GNC stopped selling products that contain BMPEA, including products labeled as containing AR that were spiked with BMPEA.

153.    Additionally, the Oregon Department of Justice (ODOJ) conducted its own testing of three dietary supplements sold by GNC in Oregon:  Jetfuel Superburn; MX-LS7; and Phenyl Core Weight Management.

154.    These products were labeled as containing AR, but were not labeled as containing BMPEA.

155.    The ODOJ's expert tested these products using state-of-the-art methodology: rapid resolution liquid chromatography-accurate mass-quadrupole-time of flight-tandem mass spectrometry.  All three products tested positive for BMPEA.

156.    Between January 2013 through May 2015, GNC sold in Oregon 340 units of seven different products that were labeled as containing AR.

157.    All but one of these seven products tested (Green Coffee Bean+Energy) tested positive for the presence of BMPEA.

158.    After November 2013, when GNC knew that AR products were at significant risk of having been adulterated with BMPEA, GNC sold at least 27 AR products that were in fact

adulterated with BMPEA.

159. In addition, GNC sold at least 105 AR products after November 2013 without disclosing that these products were at significant risk of having been adulterated with BMPEA.

160. These factual statements demonstrate that GNC has been reckless in its duties to provide safe, fat-burning, dietary and weight loss products to consumers.

### V.    How GTD Has Been and is Being Promoted and/or Advertised

161. As depicted by the below screen capture, GNC's website has described GTD as:



162. As depicted by the below screen capture, GNC's website has provided the following "Product Directions/Additional Info" about GTD:



163. As depicted by the below screen capture, GNC's website contained a photograph of the packaging of GTD which identifies the following information and ingredients:



164. As depicted by the below screen capture, GNC's website listed or lists that GTD contains the following "Other Ingredients":



165.   As depicted by the below screen capture, Grenade USA's website includes or included the following description of GTD:



166.   Prior to this suit being filed, Grenade USA's website identifies that 1550 milligrams of GTD is composed of a so-called "Proprietary Blend."

167.   On information and belief, as of May of 2018, Grenade USA's website identifies that 775 milligrams of GTD is composed of a so-called "Proprietary Blend."

168.   As reflected by the below screen capture, Grenade USA's website identifies what appear to be natural ingredients: "Green Tea Extract" and "Bitter Orange Extract."

169.   The following page contains a capture taken from Grenade USA's website:



**A. Bitter Orang Extract is Not a Safe Ingredient**

170.   Despite its innocuous sounding name, Bitter Orange Extract is not a safe ingredient.

171.   Synephrine and octopamine are compounds found in bitter orange extract.

172.   Although both synephrine and octopamine occur naturally in the Citrus Aurantium plant, they also can be made in a laboratory through synthetic means.

173.   The chemical structure of synephrine is similar to ephedrine, a weight-loss product banned by the Food and Drug Adminstration ("FDA") in 2004.

174.   Synephrine's chemical structure is similar to ephedrine and linked synephrine to life-threatening side-effects such as cardiac adverse events, including hypertension,

tachyarrhythmia, variant angina, cardiac arrest, QT prolongation, ventricular fibrillation, myocardial infarction, and sudden death have been the most common adverse effects associated with synephrine intake.

175. The National Collegiate Athletic Association (NCAA) has banned synephrine and octopamine. *See*, http://www.ncaa.org/2018-19-ncaa-banned-drugs-list

176. The World Anti-Doping Agency (WADA) bans octopamine, but synephrine has yet to be listed as a banned substance.

177. On information and belief, GTD has been banned in Canada since 2008.

178. On information and belief, until recently, GTD contained or may still contain unhealthy and dangerous concentrations of Bitter Orange Extract.

179. On information and belief, until recently, GTD contained or may still contain unhealthy and dangerous concentrations of synephrine.

180. On information and belief, until recently, GTD contained or may still contain unhealthy and dangerous concentrations of octopamine.

181. On information and belief, Plaintiff's near death experience and resultant injuries were caused by GTD's unsafe levels of Bitter Orange Extract, synephrine and/or octopamine found within the GTD formula.

182. In 2012, the United Kingdom's Medicines and Healthcare Products Regulatory Agency ("MHRA") found that two ingredients in GTD were not suitable to be used in nonprescription drugs.

183. The MHRA determined that GTD's use of bitter orange extract, or synephrine, was a compound that was closely related to ephedra (a banned substance in the U.S.).

184. The MHRA's finding required GTD's United Kingdom ("UK") based

manufacturer(s) to reformulate a special UK version of GTD which did not include bitter orange extract or synephrine.

185. On November 16, 2010, the MHRA identified the following warning related to GTD's predecessor, "Grenade Fat Burner".

186. A screen image of the warning is identified below:



187. This screen imagine is taken from an archived page found at http://webarchive.nationalarchives.gov.uk/20101116150224/http://www.mhra.gov.uk/PrintPreview/DefaultSP/CON013902

188. The same warning and reference to "Grenade Fat Burner" was issued by the MHRA on July 5, 2009.

189. MHRA's July 5, 2009, warning is (or was hosted) at the following website.

http://webarchive.nationalarchives.gov.uk/20090705050514/http://www.mhra.gov.uk/Howweregulate/Medicines/Herbalandhomoeopathicmedicines/Herbalmedicines/HerbalSafetyNews/Currentsafetyissues/CON013902

190.   Synephrine is a banned supplement in the UK and is only available via prescription.

191.   GTD's predecessor, "Grenade Fat Burner", was "not authorized for sale in Canada"

in or around 2008 as a result of it containing ephedra and/or synephrine.

192.   GTD is banned in Canada because it contains synephrine.

193.   According to the Healthy Canadians recall website post:

> The MHRA warned consumers not to use the ephedrine-containing products
> Therma Power (red variety) and Grenade Fat Burner after the products were
> associated with serious adverse reactions, including a report of death.

194.   The MHRA website alert can be found at http://healthycanadians.gc.ca/recall-alert-

rappel-avis/hc-sc/2008/13942a-eng.php.

195.   The last date this page was modified is listed as "2013-05-02."

196.   According to the Healthy Canadians recall website post:

> Synephrine is a substance similar to ephedrine and may have similar cardiovascular
> adverse effects that could lead to stroke, heart attack and/or death. Caffeine is a
> stimulant that can significantly increase the effects of synephrine. *Id.*

197.   The Healthy Canadians recall website identified the "[p]ossible side effects" to

ephedrine as follows:

> Possible side effects
>
> Ephedra is a plant source of the active ingredient ephedrine. Side effects
> associated with the use of ephedrine include dizziness, headache, decreased
> appetite, anxiety, restlessness or nervousness, digestive problems, irregular or fast
> heartbeat, insomnia, flushing, sweating, high blood pressure, stroke, seizures,
> psychosis and death:
>
> Use of products containing Ephedra/ephedrine or synephrine is not recommended
> for people with heart problems, high blood pressure, thyroid disease, diabetes,
> enlarged prostate, anxiety and restlessness, glaucoma (serious eye disorder) and
> pheochromocytoma (serious gland disorder).
>
> Consumers should use Ephedra/ephedrine products only for nasal decongestion,
> and should not exceed the maximum allowable dosage described in the Ephedra
> and ephedrine labelling standards, unless recommended and supervised by a
> health care practitioner. Labelling standards for Ephedra and ephedrine are on the

Health Canada web site. These products should be avoided during pregnancy and lactation. *Id*.

198.    The ingredients listed in the below screen capture image are or were listed on Grenade USA's website during the relevant time period:



**B.    Youhimbe Bark Extract is Not a Safe Ingredient**

199.    The MHRA disapproved of the fact that GTD (as it was then formulated for sale in the United Kingdom) contained Yohimbe.

200.    Yohimbe is a banned supplement in the UK and is only available via prescription

201.    On December 18, 2015, Consumer Reports published an article which states that "taking dietary supplements with yohimbe is risky."

202.    This article can be found at https://www.consumerreports.org/vitamins-supplements/dangerous-dietary-supplements-with-yohimbe/

203.    According to the 2015 Consumer Reports article:

Looking to enhance sexual performance, cure erectile dysfunction, lose weight, or improve your athletic ability? Dietary supplements listing the botanical ingredient

yohimbe claim to provide a "natural" quick fix for all those and more. The ingredient, extracted from the bark of the African Pausinystalia yohimbe tree, is now found in more than 550 supplements.

But taking dietary supplements with yohimbe is risky, according to a new study published online in the journal Drug Testing and Analysis. Yohimbe has been linked to fatigue, stomach disorders, and even paralysis and death. Yet labels often don't mention those risks, the study found.

Worse, in many cases the products—bought at CVS, Walgreens, GNC, Rite Aid, Vitamin Shoppe, Walmart, and Whole Foods—contained much more (and sometimes less) of the ingredient than they claimed. Most troubling, the study found that many products contained potentially dangerous levels of a yohimbe-derived drug.

"The law regulating supplements is so weak that it does not even require manufacturers to declare what's actually in supplements, even when supplements contain the equivalent of powerful, prescription-strength drugs," says Harvard Medical School internist and dietary supplement expert Pieter Cohen, M.D., who conducted the study. "Consumers are exposed to potent drugs without even knowing the dose or safety of what they're taking," he says. *Id*.

204. The consumer Reports article identified hospitalizations linked to supplements containing Yohimbe:

While that drug is now rarely used, yohimbe supplements (supposedly containing just the natural extract) are still popular—despite a long history of risks. Supplements containing it have been linked to more than 130 hospitalizations between 2000 and 2006 in California alone, for example. And in 2013, U.S. Poison Control Centers logged 227 cases related to yohimbe supplements—99 of which required treatment in a health care facility. Concerns about yohimbe have prompted Australia, Canada, the Netherlands, the U.K., and other countries to ban supplements that contain it. *Id*.

205. The Canadian government has identified Yohimbe on its website for "[r]ecals and safety alerts." http://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2017/65132a-eng.php

206. According to Healthy Canadian's posting from November 17, 2017, updated on May 23, 2018:

**Yohimbine** is a prescription drug and should be used only under the supervision of a health care professional. Yohimbine is derived from yohimbe, a bark extract. The use of yohimbine or yohimbe may result in serious adverse reactions, particularly in people with high blood pressure, or heart, kidney or liver disease. Side effects include increased blood pressure and heart rate, anxiety, dizziness, tremors,

headache, nausea and sleep disorders. It should not be used by children, or pregnant or nursing women. *Id.*

207.   On information and belief, until recently, GTD contained or may still contain unhealthy and dangerous concentrations of Yohimbe Bark Extract.

208.   On information and belief, Plaintiff's near death experience and resultant injuries were caused by GTD's usage of unsafe levels of Yohimbe Bark Extract.

209.   B-PEA is similar to the synthetic drug amphetamine.

210.   On information and belief, GTD has contained B-PEA.

211.   B-PEA can cause rapid heart rate, anxiety, agitation or sudden death.

212.   On information and belief, in the past GTD has contained or may still contain B-PEA.

213.   On information and belief, the GTD sold to Plaintiff may have contained trace amounts B-PEA.

214.   On information and belief, if the GTD sold to Plaintiff may have contained trace amounts B-PEA, these trace amounts may have Plaintiff to be harmed as described above.

## VI.   Defendants Knew that GTD Was Dangerous

215.   As set forth above, GNC and Grenade USA knew or should have known that GTD was and is dangerous to consumers and not fit for any lawful purpose.

216.   GNC and Grenade USA failed disclose and/or warn Plaintiff and other consumers that GTD contains a harmful and dangerous amphetamine like compound or substance.

217.   Despite knowing that GTD is dangerous and not fit for any purposes, let alone as a dietary supplement, GNC and Grenade USA placed GTD in the stream of commerce in the State of Illinois and throughout the United States.

218.   GNC and Grenade USA have failed to provide consumers like Plaintiff with vital

information concerning the risks posed to consumers by GTD.

219.  On information and belief, GNC and Grenade USA have actively concealed the risks to health posed by GTD.

220.   GNC and Grenade USA knew or should have known that Plaintiff would suffer damages as the result of using GTD.

221.  GNC and Grenade USA's failure to disclose the dangers associated with GTD about which they knew or should have known constitutes fraud, negligent misrepresentation and unfair, unlawful, fraudulent, and deceptive business practices under Illinois law and the laws of several states.

222.  On information and belief, GNC did not fully comply with the DOJ non-prosecution agreement because it did not fully vet or test GTD to ensure that it was safe for consumers.

223.  Had GNC complied with its obligations under the December 2016 non-prosecution agreement, it never should sold GTD to Plaintiff because GNC would have tested GTD and learned that it contained harmful and dangerous amphetamine-like substance.

### VII.   Plaintiff's Purchase and Use of GTD

224.  Plaintiff purchased GTD in or around late September 2017 or early October 2017 at the GNC store in Mount Prospect, Illinois.

225.  Before purchasing a bottle of GTD, Plaintiff reviewed the product information that GRENADE USA placed on the packaging that housed GTD.

226.  GRENADE USA's packaging did not inform Plaintiff that GTD contained adulterated amphetamine-like ingredients that may not be lawfully used in dietary supplements.

227.  Before purchasing a bottle of GTD, Plaintiff talked with a sales representative about

GTD and asked the sales representative if GTD was a safe product to take.

228. The GNC representative with whom Plaintiff spoke assured Plaintiff that "Grenade was a safe, GNC-backed product."

229. The GNC representative never informed Plaintiff that GTD contained amphetamine-like ingredients that could not be lawfully used in dietary supplements.

230. The GNC representative never informed Plaintiff that GTD contained amphetamine-like ingredients that should not have been used in dietary supplements.

231. Plaintiff purchased and consumed GTD because it was advertised as a dietary/weight loss product that contained "scientifically researched ingredients designed to target body fat and preserve maximum lean muscle."

232. If Plaintiff had known that GTD did or could contain amphetamine-like ingredients, he would not have purchased or consumed GTD.

233. If Plaintiff had known that GTD was unsafe, he would not have purchased or consumed GTD.

234. If Plaintiff had known that GTD contained unlawful substances, he would not have purchased or consumed GTD.

235. Plaintiff suffered an adverse reaction to GTD on November 28, 2017.

236. Because of Plaintiff's adverse reaction to GTD on November 28, 2017, he was rushed to a hospital by emergency medical technicians.

237. Plaintiff stopped breathing during his transportation to the hospital and was intubated.

238. Toxicology screening tests at the admitting hospital did not find any illegal drug in Plaintiff's blood stream.

239. The toxicology tests indicated that Plaintiff tested positive for amphetamines.

240. Plaintiff, however, did not knowingly ingest any amphetamines in the day or weeks leading up November 28, 2017.

241. Accordingly, the only plausible source of a positive test result for amphetamines was Plaintiff's usage of and consumption of GTD.

242. Plaintiff was hospitalized as a result to his body's adverse reaction to GTD.

243. Because of GNC's acts and/or omissions, Plaintiff did not receive the benefit of his purchase – the purchase of a safe dietary supplement.

244. As a result of Grenade USA' acts and/or omissions, Plaintiff did not receive the benefit of his purchase – the purchase of a safe dietary supplement.

245. GNC's concealment and non-disclosure of the dangerous nature of GTD was misleading and dangerous to consumers like Plaintiff.

246. Grenade USA's concealment and non-disclosure of the dangerous nature of GTD was misleading and dangerous to consumers like Plaintiff.

247. Notwithstanding Plaintiff's efforts to inform GNC that he was nearly killed after he consumed GTD, GNC failed and/or refused to remove GTD from sale at GNC stores and GNC's website.

248. As of the date of filing of this civil action, GNC still sells GTD on its website.

249. As detailed below, other consumers have had similar ill effects after ingesting GTD.

250. After Plaintiff complained to GNC about how his consumption GTD almost killed him, GNC continued to sell GTD at physical stores.

251. On information and belief, more than four dozen other persons have been similarly harmed by their consumption of GTD.

252. Plaintiff has been damaged by GNC and Grenade USA's conduct.

## VIII.   CLAIMS FOR RELIEF

### COUNT I:  NEGLIGENT MISREPRESENTATION

### Versus the GNC and Grenade USA

253. Plaintiff hereby re-alleges the preceding paragraphs as if fully set forth below.

254. GNC and Grenade USA had a duty to disclose to Plaintiff the GTD's actual quality and characteristics.

255. GNC and Grenade USA negligently and/or carelessly misrepresented, omitted and concealed from consumers material facts relating to the dangerous quality and characteristics of GTD, including but not limited to the fact it could contain dangerous, life-threatening amphetamine-like substances

256. These misrepresentations and omissions were material and concerned the specific characteristics and quality GTD that a reasonable consumer would consider in purchasing any dietary supplement.

257. GNC and Grenade USA made such false and misleading statements and omissions on their websites and product labeling, and in their advertisements and warranties, with the intention of inducing Plaintiff to purchase GTD.

258. Because of each Defendant's misstatements, they were under a duty to disclose facts necessary to correct those misstatements.

259. Defendant Grenade USA was in a better position to discover the misrepresentations than Plaintiff because it controlled GTD's design, manufacturing, testing, marketing, and advertising processes.

260. GNC was in a better position to discover the misrepresentations than Plaintiff because on information and belief, it tested GTD and it controlled how GTD was marketed,

advertised, and sold.

261.    Further, as described above in relation to Plaintiff's post-injury complaint to the GNC retail store, GNC controlled how it investigated consumer complaints associated with GTD.

262.    GNC and Grenade USA advertised and marketed GTD with the intent to induce Plaintiff to purchase GTD.

263.    At the time it made the representations, GNC and Grenade USA knew, or by the exercise of reasonable care should have known, that the statements contained on each packaging of GTD were false and misleading.

264.    GNC and Grenade USA knew or, should have known, that without the misrepresentations and/or omissions, Plaintiff would not have purchased GTD.

265.    Plaintiff justifiably relied upon Defendants' misrepresentations about GTD's quality and characteristics.

266.    Plaintiff is and was unaware of the falsity of Defendants' misrepresentations and omissions and, as a result, justifiably relied on them in deciding to purchase GTD.

267.    Had Plaintiff been aware of the true nature and quality of the products, they would not have purchased it.

268.    As a direct and proximate result of Defendants' misrepresentations and omissions of material fact, Plaintiff has suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

**Wherefore**, Plaintiff is entitled to judgment in his favor and against Defendants GNC and Grenade USA in an amount to be determined.

## COUNT II – DESIGN DEFECT

### Versus Grenade USA

269.    Plaintiff hereby re-alleges the preceding paragraphs as if fully set forth below.

270.    At all relevant times, Grenade USA designed and developed distributed, and marketed and sold GTD on a commercial basis to retailers like GNC.

271.    At all relevant times, Grenade USA designed developed, distributed, marketed, and sold GTD on a commercial basis to retail customers.

272.    Grenade USA's design of GTD, including the inclusion and combination of the above ingredients, and in particular, the inclusion and combination of ingredients banned in various countries, was and is defective, and because of such design defects, GTD was defective and unreasonably dangerous to the consuming public, including the Plaintiff.

273.    GTD, as created by Grenade USA, is and was unreasonably dangerous and posed a substantial likelihood of harm at the time it was and is sold.

274.    Grenade USA's defective design of GTD existed prior to any manufacturing process.

275.    Grenade USA's defective design of GTD existed at the time it was sold and/or when it left Grenade USA's possession or control.

276.    The risks inherent in the design of GTD outweigh the alleged benefits of its design.

277.    GTD's defective design remained unchanged and reached Plaintiff in an unaltered state.

278.    GTD failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by Defendants.

46

279.    Grenade USA's design of GTD proximately caused harm to Plaintiff.

280.    Upon information and belief, and as explained above relative to different designs of GTD in the United Kingdom, feasible alternatives existed to make GTD safer for its intended use at the time of its design.

281.    GTD was expected to and did reach Plaintiff without substantial change to the condition in which they were manufactured and sold by Grenade USA.

282.    The defects and unreasonably dangerous conditions of GTD has proximately caused and will continue to proximately cause damage to Plaintiff.

283.    Defendant Grenade USA could and should reasonably have foreseen the inherent risks created by utilizing GTD as well as the type of harm suffered by Plaintiff.

284.    GTD sold to Plaintiff was defective and unfit for its intended use.

285.    Because of the foregoing, Plaintiff has suffered damages as previously set forth herein that were directly and proximately caused by GTD.

**Wherefore**, Plaintiff is entitled to judgment in his favor and against Defendant Grenade USA in an amount to be determined.

## COUNT III – STRICT PRODUCTS LIABILITY

### Versus GNC

286.    Plaintiff hereby re-alleges the preceding paragraphs as if fully set forth below.

287.    Plaintiff was injured as a result of GTD and his injury resulted from the unreasonably dangerous nature of GTD, where GNC knew of the unreasonably dangerous nature of at the time when GTD left Grenade USA's control.

288.    Both GNC and Grenade USA negligently and/or carelessly misrepresented, omitted and concealed from consumers material facts relating to the dangerous quality and

characteristics of GTD, including but not limited to the fact it could contain dangerous, life-threatening amphetamine-like substances.

289.  Both GNC and Grenade USA caused GTD to be promoted and sold in a manner that would prevent a reasonable consumer from knowing how dangerous of a product GTD is or was.

290.  Further, as noted above, the version of GTD sold in the United States by and through GNC contains ingredients that are banned in other countries and GNC knew of these facts or should have known about these facts.

291.  Additionally, GNC knew or should have that GTD contained dangerous amphetamine-like substances and should not have sold GTD.

292.  Based upon the above acts and omissions, the magnitude of the danger posed by GTD outweighed the utility of the product as designed by Grenade USA, and these facts were known or should have been discovered by GNC.

293.  As a direct and proximate result of Defendants' misrepresentations and omissions of material fact, Plaintiff have suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

**Wherefore**, Plaintiff is entitled to judgment in his favor and against Defendant GNC in an amount to be determined.

### COUNT IV – UNJUST ENRICHMENT

### Versus GNC

294.  Plaintiff hereby re-alleges the preceding paragraphs as if fully set forth below.

295.  Plaintiff conferred a benefit upon GNC.

296.  Plaintiff paid money to GNC to purchase GTD.

297.   Plaintiff paid more for the GTD than they should have and/or would have paid if they knew that GTD was adulterated with amphetamine-like substances.

298.   Plaintiff would never have purchased GTD from GNC if it knew that GTD was designed defectively.

299.   Plaintiff would never have purchased GTD from GNC if it knew that GTD was unsafe as designed.

300.   Plaintiff conferred an economic benefit upon GNC because GNC profited as a result from Plaintiff paying money to purchase these products.

301.   GNC retained and appreciated the benefits conferred on them by Plaintiff.

302.   GNC retained those benefits under circumstances that make it inequitable for GNC to retain the benefits without paying the value of those benefits.

303.   Specifically, GNC retained those benefits despite the fact that the GTD were adulterated and unlawful but failed to disclose the fact that GTD were adulterated and unsafe.

304.   GNC, by and through its industry knowledge and independent testing knew or reasonably should have known that GTD was designed defectively.

305.   It would be unjust if GNC was to retain the economic benefit of sales of GTD under these circumstances.

306.   Plaintiff seeks the disgorgement and restitution of GNC's wrongful profits, revenue, and benefits to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy the GNC's unjust enrichment.

**Wherefore**, Plaintiff is entitled to judgment in his favor and against Defendant GNC in an amount to be determined.

## COUNT V – UNJUST ENRICHMENT

### Versus Grenade USA

307.    Plaintiff hereby re-alleges the preceding paragraphs as if fully set forth below.

308.    Plaintiff conferred a benefit upon Grenade USA.

309.    Plaintiff paid money to Grenade USA to purchase GTD.

310.    Plaintiff paid more for GTD than they should have and/or would have paid if they knew that GTD was adulterated with amphetamine-like substances.

311.    Plaintiff would never have purchased GTD from Grenade USA if they knew that GTD was designed defectively.

312.    Plaintiff never have purchased GTD from Grenade USA if they knew that GTD was unsafe as designed.

313.    Plaintiff conferred an economic benefit upon Grenade USA because Grenade USA profited as a result from Plaintiff paying money to purchase these products.

314.    Grenade USA retained and appreciated the benefits conferred on it by Plaintiff.

315.    Grenade USA retained those benefits under circumstances that make it inequitable for Grenade USA to retain the benefits without paying the value of those benefits.

316.    Specifically, Grenade USA retained those benefits despite the fact that GTD was adulterated and unlawful, but failed to disclose the fact that the GTD was adulterated and unsafe.

317.    Grenade USA knew or reasonably should have known that GTD was designed defectively.

318.    It would be unjust if Grenade USA were to retain the economic benefit of sales of GTD under these circumstances.

319.    Plaintiff seeks the disgorgement and restitution of Grenade USA's wrongful

profits, revenue, and benefits to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Grenade USA's unjust enrichment.

**Wherefore**, Plaintiff is entitled to judgment in his favor and against Defendant Grenade USA in an amount to be determined.

### COUNT VI:  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT

### Versus GNC and Grenade USA

320.    Plaintiff hereby re-alleges the preceding paragraphs as if fully set forth below.

321.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.

322.    The ICFA is to be liberally construed to effectuate its purpose.  815 ILCS 505/11a.

323.    As set forth above and detailed below, GNC and Grenade USA have engaged in unfair, deceptive, and misleading business practices in violation of Illinois law.

324.    Defendants have violated the ICFA's statutory prohibition against engaging in unlawful acts and practices by, inter alia, making the representations and omissions of material facts with the "intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission" in connection with the sale of GTD.

325.    Pursuant to Illinois law, Defendants had a duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the Products to Plaintiff.

326.    In connection with their sale of GTD to Illinois residents, Defendants engaged in unfair and deceptive acts and practices, as alleged in this Complaint, including, without limitation:

unfairly and deceptively misrepresenting the benefits and quality of GTD to Illinois consumers; unfairly and deceptively advertising GTD as identified above as a safe method of combating fat and delivering energy; and unfairly and deceptively omitting that GTD contained the above-identified unsafe ingredients.

327. Defendants' practice of misrepresenting true nature of GTD is unfair and offends public policy and is immoral, unethical, and unscrupulous.

328. Illinois consumers have been misled about the dangerous nature of GTD.

329. Defendants' Misrepresentations regarding the efficacy and safety of GTD as a dietary and weight loss supplement offends the public's expectation to be told the truth about the products they are buying and consuming.

330. As a result of Defendants' unfair and deceptive conduct, Plaintiff sustained damages including but not limited to the damages detailed above, incorporated herein.

331. Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the dietary supplements to Plaintiff.

332. Defendants intended that Plaintiff would rely on their materially deceptive advertisements and misrepresentations, leading him to purchase GTD as a direct result of Defendants' deceptive statements and conduct regarding the effects of GTD.

333. Accordingly, Defendants' deceptive representations and material omissions to Plaintiff constitute unfair and deceptive acts and practices under Illinois Law.

334. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff.

335. Plaintiff was deceived by Defendants' misrepresentations.

336. As a proximate result of Defendants' misrepresentations, Plaintiff has suffered

ascertainable losses, in an amount to be determined at trial.

**Wherefore**, Plaintiff is entitled to judgment in his favor and against Defendants GNC and Grenade USA in an amount to be determined.

## IX.    JURY TRIAL DEMANDED

*Plaintiff Jay Rossi demands a trial by jury on all issues so triable.*

*Attorney for Plaintiff Jay Rossi,*

*/s/ James C. Vlahakis*
James C. Vlahakis
Sulaiman Law Group, Ltd.
2500 S. Highland Avenue, Suite 200
Lombard, IL 60148
Phone No.:  630-581-5456
Fax No.: 630-575-8188
jvlahakis@sulaimanlaw.com