## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAY ROSSI,<br>     Plaintiff,<br>v.<br><br>GENERAL NUTRITION CORPORATION and GRENADE® USA, LLC,<br>     Defendants. | No. 1:19-cv-01417<br><br>Honorable Manish S. Shah |

**PLAINTIFF'S RESPONSE TO MOTION TO COMPEL ARBITRATION**

JAY ROSSI ("Plaintiff" or "Rossi"), by his counsel, James C. Vlahakis opposes Defendant General Nutrition Corporation's Motion to Compel Arbitration (Dkt. ):

### I.  Introduction

Defendant General Nutrition Corporation ("GNC") is the world's largest dietary supplement retailer. Dkt. 10, First Amended Compliant ("FAC") ¶ 1. When Rossi visited a GNC store in Mount Prospect, Illinois, GNC sold Rossi a dietary supplement product called GRENADE - THERMO DETONATOR® ("GTD"). GTD was manufactured by Defendant GRENADE® USA, LLC ("Grenade USA"). Rossi has brought this civil action against Defendants GNC and Grenade USA because the bottle of GTD that he purchased almost killed him because the product was laced with an amphetamine like substance.

Despite the fact that Plaintiff did not agree to an arbitration agreement at the time he purchased GTD, GNC is moving to compel arbitration by contending that Plaintiff agreed to arbitrate his various claims when – weeks after he purchased GTD – he allegedly signed up for a GNC's "myGNC Rewards Program."

### II.  Background Facts

In or around *late* September 2017, or *early* October 2017, while Rossi was living in the State of Illinois, he purchased a bottle of GTD at the GNC store in Mount Prospect, Illinois. FAC ¶6.  The GTD that Plaintiff ingested was apparently laced with an

1

amphetamine like substance that almost killed him and caused him to be hospitalized for five days in November of 2017. FAC ¶¶7-9, 239-42. Plaintiff suffered an adverse reaction to GTD on November 28, 2017, and was rushed to a hospital by emergency medical technicians. FAC ¶¶235-36. Rossi believes that the GTD that he purchased contained dangerous levels of one or more of the following ingredients: Yohimbe Bark Extract; Bitter Orange extract; Synephrine and/or Octopamine. FAC ¶¶10-11. Grenade USA is not a party to GNC's Motion. As the FAC reflects, nothing on the packaging of GTD requires a user to arbitrate his or her claims that GTD caused him/her harm.

After Rossi recovered from his near death experience, he returned to the store where he purchased GTD to alert the GNC that the GTD that he purchased had almost killed him. FAC ¶12. When Rossi returned to the GNC store in question, he spoke with a male employee and asked to speak with the store's manager. FAC ¶13. The employee told Rossi the manager had gone off for the day. FAC ¶14. Thereafter, Rossi told the employee that he had been hospitalized for five days after ingesting a recommended dosage of GTD. FAC ¶15. In particular, Rossi told the store employee that he had stopped breathing and had hallucinated after ingesting GTD. *Id.*

The GNC store employee told Rossi that he was going to call the GNC store manager, and dialed a number in Rossi's presence. FAC ¶17. The employee then spoke with another person who answer the employee's phone call. *Id.* During the employee's conversation, Rossi heard the employee use a three-letter code "AER"[1] to describe the nature of Rossi's verbal complaint. FAC ¶18. After the GNC store employee concluded his conversation with presumed GNC store manager, the employee asked for Plaintiff's name and typed it into the store's computer. FAC ¶20. Thereafter, the employee called

---

[1] AER stands for "Adverse Event Return", a return of a product to GNC where the product resulted in an "adverse event" with regard to the person returning the product. FAC ¶19.

2

GNC s corporate offices. FAC ¶21. When no one answered, the employee asked Rossi for his telephone number and said "someone will call you from corporate." FAC ¶22-23.[2]

No one from with GNC has ever contacted Rossi. FAC ¶27. Two things plausibly happened after Plaintiff returned the GTD to the point of purchase. First, GNC and/or GNC's employee took no effort to determine whether the GTD Plaintiff returned was tested for any harmful substances. FAC ¶38. Second, GNC analyzed the contents of the GTD bottle and learned that the ingredients were laced with a harmful, amphetamine like substance. FAC ¶39.[3] Despite the fact that nobody from GNC ever followed up with him, GNC now seeks to compel arbitration of Plaintiff's claims.

### III. Summary of Argument in Opposition to GNC's Motion to Compel

Plaintiff objects to GNC's attempt to force him to arbitrate his claims where GNC does not claim that Plaintiff agreed to arbitrate any and all claims related to his use of GTD *at the time that Plaintiff purchased GTD* from a brick and mortar GNC store located in Mount Prospect, Illinois, in or around September or October of 2017. The facts of this case unlike the typical case where a consumer has made an on-line purchase and *prior to paying for the product*, the consumer is asked to agree to arbitrate his/her potential claims and the consumer consents by "clicking" a box to signify that the consumer has read and/or agrees to be bound by the proffered terms (including arbitration).

The circumstances of this case are unique in the sense that GNC contends that Plaintiff – *weeks after he purchased GTD* – clicked on terms and conditions that

---

[2] Rossi was concerned that other consumers were at risk of summary similar injuries. FAC ¶25. In an effort to help GNC prevent a similar episode to the one he suffered, Rossi decided to leave his GTD bottle (which contained some of the remaining GTD product) in the custody of the employee. FAC ¶26. Rossi left the product with the GNC employee with the hope that the employee would preserve the sample for future testing. FAC ¶¶26-27.

[3] Despite a minute order from the court (Dkt. 19) GNC has not indicated whether in fact the bottle and its contents were ever preserved by the employee and/or preserved by GNC.

contained an arbitration clause – after Plaintiff was sent an "account activation email." Dkt. 17, pp. 1, 3. GNC claims that its myGNC Rewards Program "is free to customers and is a way for customers to accumulate points and cash-back rewards." *Id.* p. 1. In contrast to a traditional *time-of-purchase* offer and acceptance of arbitration, GNC claims that Plaintiff agreed to arbitrate any claims related to his *prior purchase* of GNC as a result of him becoming a member of GNC's myGNC Rewards Program. Generally speaking, GNC states that "[c]ustomers may sign up either in-store or online to join the myGNC Rewards program. ([Dkt. 17-1] at ¶ 4). If a customer signs up in-store, he or she later receives a new account activation email within 24 hours with instructions on how to set up his or her account. (Id.)." Dkt. 17, p. 3.

Here is where things begin to go sideways. First, GNC does not adequately explain the basis for claiming that "Plaintiff became a myGNC Rewards member on September 19, 2017." Dkt. 17, p. 6, citing Dkt. 17-1, Declaration of Jenna O'Connor at ¶ 8. There are no facts or authenticated screen shots, to explain Ms. O'Connor's testimony. Nor are there any facts to explain why Plaintiff allegedly signed up for the myGNC Rewards Program - weeks after he purchased GTD. Here is what GNC argues – with little or no support:

1. "Once Plaintiff became a [myGNC Rewards Program] member, he was requested to "activate" his account on a website";

2. Part of the so-called "'activation' process" required Plaintiff to "'check[] a box' to certify that he agreed to certain Terms and Conditions of the myGNC Rewards Program";

3. "Had Plaintiff not affirmatively agreed to these Terms and Conditions, he would not have been permitted to activate his account";

4. GNC argues that Plaintiff "did, in fact, 'activate' his account, and he received 'bonus points' through the myGNC Rewards Program"; and

5. GNC claims that Plaintiff activated his myGNC Rewards Program on October 25, 2017.

4

Dkt. 17, pp. 1-2, 6.

GNC ignores the fact that Plaintiff did not activate his myGNC Rewards Program *at the time he purchased the GTD in question* – which took place in *late* September of 2017, or *early* October of 2017. FAC, ¶6. GNC glosses over when Plaintiff purchased the GTD product.[4] GNC's fails to identify any temporal time-line, and instead argues in conclusory fashion "[a]ccordingly, there exists a binding contract between GNC and Plaintiff, which includes an arbitration provision that relates to 'any dispute' regarding 'any purchases'." Dkt. 17, p. 2. GNC goes on to argue, again, without any time-line, that "[b]ecause Plaintiff's claims relate to his alleged 'purchase' of GTD, he is required to arbitrate his claims rather than litigate them in this Court." *Id*. To recap, GNC is seeking to use Plaintiff's alleged acceptance of so-called "Rewards Program" to <u>back date</u> an onerous arbitration clause by several weeks. This is unconscionable. GNC's also ignores that the facts and circumstances of Plaintiff's purchase of GTD. GNC argues that Plaintiff agreed to waive his right to sue GNC when he allegedly signed up for myGNC Rewards Program on October 25, 2017. Plaintiff, however, purchased the GTD product in *late* September 2017, or *early* October 2017. This case more closely resemble *Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979 (N.D. Ill. 2008) where the plaintiff was presented with an arbitration agreement *after* the plaintiff purchased the product in question (an iPhone).

## IV. Standard of Review

The enforceability of an arbitration agreement is determined by reference to the pertinent state law principles governing the formation of contracts. *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944, (1995). General state-law contract defenses such as

---

[4] The word "purchased" appears in only two parts of GNC's Memo of Law. Dkt. 17, p. 2.

fraud, duress, or unconscionability may operate to invalidate an arbitration agreement. *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687 (1996). Illinois applies because Plaintiff is an Illinois resident and purchased GTD from a GNC store in this district.

### V.     Argument in Opposition

GNC's Motion to Compel focuses on how consumers like Plaintiff can sign up for myGNC Rewards Program at GNC stores or on-line (presumably at the time that a consumer purchases a product from GNC's website. GNC argues that "[w]hen activating an account, customers must accept and agree to the myGNC Rewards Terms and Conditions." Dkt. 17, p. 3. Thereafter, GNC argues that in order to activate a myGNC Rewards Program, "customer must have clicked a button next to text stating that, by doing so, 'I agree to Terms & Conditions'." *Id.* GNC goes on to argue "[a] customer could not activate a myGNC Rewards account without clicking the box assenting to the Terms and Conditions." *Id.* GNC's Motion, however, ignores that Plaintiff was able to purchase the GTD in question *without* having to activate a myGNC Rewards Program.

#### A. GNC's Motion to Compel Fails to Authenticate Key Evidence

GNC's Motion to Compel fails to authenticate key evidence. For starters, the attached declaration (Dkt. 17-1, ¶6) does not explain how the "account activation website" on page four (4) of GNC's Memorandum of Law is what was allegedly seen by Plaintiff on October 25, 2017. Second, nowhere does the declarant explain why "Mr. Rossi must have agreed to the Terms and Conditions" (Dkt. 17-1, ¶10) other than to conclude, without any factual support that "[o]therwise, he would not have been able to activate his account[.]" No electronic audit trail has been provide and the declarant has not identified an IP address (or email) in any way linked to Mr. Rossi. Third, while GNC argues "[t]he Terms and Conditions that were in place at the time relevant to this matter alerted the customer, multiple times, about arbitration", the declaration does not

identify the font utilized by GNC's so-called "account activation website." See, Dkt. 17, p. 5.  Judge Kennelly was critical of a defendant's failure to explain font size when he denied a motion to compel arbitration. *Trujillo*, 578 F. Supp. 2d at 986 f2 (N.D. Ill. 2008).

**B.  GNC's Terms Do Not Require Rossi to Arbitrate *Pre-Activation* Purchases**

GNC has failed to point to any case which supports its argument that Plaintiff must arbitrate claims related to a product that he purchased *before* he allegedly activated the myGNC Rewards program.  GNC's generally cites to cases holding that consumers can be bound by so-called "clickwrap" arbitration agreements. Dkt. 17, p. 8. GNC's reliance on *Sherman v. AT&T Inc.*, No. 11 C 5857, 2012 WL 1021823 (N.D. Ill. Mar. 26, 2012) at page eight (8) of is Memorandum of Law is flawed because the court in Sherman dealt with the activation of internet service – and the activation of the internet service could only occur after the consumer clicked to demonstrate his/her agreement to the applicable terms and conditions. *Sherman*, 2012 WL 1021823, *1, *3. Here, Plaintiff purchased GTD weeks prior to allegedly activating myGNC Rewards.

GNC's reliance on *Friends for Health: Supporting North Shore HealtH Center v. PayPal, Inc.*, No. 17 CV 1542, 2018 WL 2933608 (N.D. Ill. June 12, 2018), is similarly flawed because the consumer in that case had to agree to PayPal's term before the PayPal account could be opened.  According to GNC's analysis, "the plaintiffs 'had to complete a registration process to open a PayPal account' and to 'complete that process, they had to affirmatively check a box, or click a button, indicating that they accepted the user agreement'." Dkt. 17, p. 9. In contrast, Plaintiff purchased the GTD product weeks prior to allegedly activating the myGNC Rewards program.

GNC's reliance on *O'Quinn v. Comcast Corp.*, No. 10 C 2491, 2010 WL 4932665 (N.D. Ill. Nov. 29, 2010), misses the mark because the circumstances in *O'Quinn* are different. Dkt. 17, p. 9. Again, the court in *O'Quinn* indicated that the arbitration clause

7

was presented to the consumer at the time he/she obtained the product in question – internet services. According to *O'Quinn*, "Comcast's routine practice is to provide customers with the Customer Agreement at the time services are installed and to require the customer to click a box accepting the Customer Agreement in order to access Comcast's Internet service for the first time." *O'Quinn*, 2010 WL 4932665, *3.

GNC also erroneously relies on *Thompson v. AT&T Services, Inc.*, No. 17 C 3607, 2018 WL 4567714 (N.D. Ill. Sep. 24, 2018). GNC's recognizes that the consumer in *Thompson* would have been unable to utilize the internet service product unless he/she clike on the terms and conditions: "[w]hen the plaintiff registered for AT&T's internet service, 'he was required to complete an online form that prompted him to check a box confirming that he read and agreed to AT&T's terms of service'." Dkt. 17, p. 10, citing *Thompson v*, 2018 WL 4567714 at *1. GNC's argument neglects to appreciate the fact that Plaintiff was able to purchase the GTD product without having to agree to the terms and conditions of GNC's myGNC Rewards program.

**C. The Arbitration Language Does Not Apply to Prior Product Purchases**

The arbitration language in question does not apply to prior product purchases. Here is the language (four simple lines), as presented by GNC's Memorandum of Law:

> The scope of the arbitration provision *is broad*. Pursuant to the Terms and Conditions, customers agreed to arbitrate "any dispute" regarding the following:
>
>> (i) your use of or interaction with the Program, (ii) *any purchases* or other transactions or relationships *with GNC*, or (iii) any data or information you may provide to GNC or that GNC may gather in connection with such use, interaction or transaction.

Dkt. 17, p. 5. A cursory review of the complete terms and conditions set forth in the myGNC Rewards Program (Dkt. 71-1) should show that GNC is not being upfront and/or candid with this Court about the language of the subject arbitration clause.

8

GNC points to the Seventh Circuit case of *Continental Cas. Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 733-34 (7th Cir. 2005) for the proposition that "the arbitration provision's broad language readily encompasses claims relating to Plaintiff's alleged purchase of GTD." Dkt. 17, p. 12. GNC also points to the Supreme Court's decision of *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986) for the proposition that "'[d]oubts should be resolved in favor of coverage.'" *Id.*

GNC goes on to argue that "[t]he language in the arbitration provision here is equally as broad and strong as the language in *AT&T Technologies, Inc.*" *Id.* GNC goes on to argue, in a conclusory manner, that "Plaintiff's entire First Amended Complaint rests upon allegations regarding his alleged purchase of GTD. This dispute, therefore, falls within the scope of the arbitration provision, and Plaintiff should be compelled to bring this matter in an arbitration." Dkt. 17, pp. 12-13. That is the extent of GNC's argument in support of its argument Plaintiff agreed to arbitrate claims related to his purchase of GTD, which took place in *late* September of 2017, or *early* October of 2017, *weeks* before he allegedly signed up for the myGNC Rewards Program, which according to GNC occurred on October 25, 2017. Dkt. 17, p. 6.

There is another flaw in GNC's argument. GNC *does not argue* that the terms of the myGNC Rewards Program *state* that the arbitration clause it will apply to *prior purchases of products sold by GNC* prior to a consumer's activation of his or her myGNC Rewards Program. According to GNC, Rossi did not activate his myGNC Rewards Program until October 25, 2017. *Id.*, p. 6 ("Plaintiff subsequently activated his account on October 25, 2017 pursuant to the above procedures."). Despite this temporal gap, GNC has not advanced any legal arguments to support why it is lawful to require Plaintiff to arbitrate his claims where the claims relate to a product he purchased well before he allegedly signed up for GNC's myGNC Rewards Program.

9

**D. Plaintiff's Reliance on *Cook v. General Nutrition Corporation* is Flawed**

Plaintiff's reliance on *Cook v. General Nutrition Corporation*, No. 17-135 (W.D. Pa. Aug. 1, 2017), is without merit. The dispute in *Cook* related to the plaintiff's prior purchase of a two-year Gold Card membership in December of 2015, and her subsequent registration for GNC's newly issued myGNC Rewards program on December 30, 2016. To be clear, *Cook* is the only case which GNC has cited to relative to the disputed arbitration clause in question. This fact alone is suspect. If GNC's right to arbitrate is as solid as GNC claims, why is there not a single other case that supports GNC's invocation of arbitration as to products purchased before or after a consumer has applied for GNC's myGNC Rewards program?

Aside from the fact that the *Cook* decision relied on Third Circuit case law, GNC's heavy reliance on the *Cook* decision is flawed because there the court simply focused on a disgruntled customer who sued GNC over GNC's discontinuation of GNC's "Gold Card Program", which allegedly took place in December of 2016. *See* Dkt. 17-2, *Cook*, Memorandum Order at pp. 2-3 ("Plaintiffs allege that around the same time Defendant terminated the Gold Card Program, it began a new free program[.]"). *Cook* did not address procedural unconscionability. Instead, it simply addressed the plaintiff's argument "that nothing in the Terms and Conditions for the myGNC Program constitutes an express designation that it supersedes the Terms and Conditions of the Gold Card Program. (Id. at 8). Swilley fails to provide any authority supporting her position that her claim is controlled by the Terms and Conditions of the Gold Card Program. (Id. at 8-9)" Cook, Memo. Op. at p. 5.[5] While *Cook* held that the terms of the

---

[5] The court also addressed and rejected the plaintiff's argument that "that there is no valid agreement to arbitrate because the Terms and Conditions provide that Defendant may change these Terms and Conditions, . . . and because the Terms and Conditions provide that Defendant may alter, limit, modify, or terminate the myGNC Program at any time." *Cook*, Memo. Op. p. 5.

10

new myGNC Program applied retroactively, the court applied Pennsylvania law. GNC has not cited to any Illinois case applying an arbitration clause retroactively. As discussed below, Judge Kennelly has held that an arbitration clause provided to a consumer after a purchase *would not* apply retroactively.

### E.  The Arbitration Clause if Unconscionable

Under Illinois law, a contract may be found unconscionable "based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (2006) (citing *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (2006)). Procedural unconscionability exists when a party "cannot fairly be said to have been aware he was agreeing to it." *Id.* at 264 (quoting *Razor*, 854 N.E.2d at 622). Procedural unconscionability takes into account the relative bargaining power of the parties to the agreement and inquires whether there has been "some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Kinkel*, 857 N.E.2d at 264 (quoting *Frank's Maintenance & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 411-12 (1980)).

The arbitration clause is unconscionable.  To recap, the language was not provided to Plaintiff when he purchased the product and the language is very confusing and favorable to GNC. And in *Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979 (N.D. Ill. 2008), Judge Kennelly has ruled against a corporate defendant in a similar fact pattern. In an earlier decision, Judge Kennelly opined as follows, "[t]he Court believes, based on its review of Illinois case law, that *the availability* of the AT&T Mobility service agreement to Trujillo *prior to his purchase of the iPhone* may be a critical factor in determining the issue of procedural unconscionability." *Trujillo*, 2008 U.S. Dist. LEXIS 32128, *7 (N.D. Ill. April 18, 2008). Judge Kennelly explained, "by the time Trujillo clicked to signify his acceptance of the AT&T Mobility agreement, he had already

11

purchased the iPhone[.]" *Id.* at *9-*10. Judge Kennelly also noted that there it did not appear that the plaintiff could reject the arbitration language and obtain a full refund. *Id.* at *10 ("There is nothing in the AT&T Mobility agreement that told Trujillo that he could, at that point, return his iPhone to Apple, or what consequences would follow if he did so. (Indeed, an argument could be made that the absence of any such indication might be a factor tilting in favor of a finding of procedural unconscionability.).")

Here, Plaintiff already purchased and used the product when he allegedly signed up for the myGNC Rewards Program. Judge Kennelly recognized that it would not have been improper for the defendant to have provided a way for the consumer to return the iphone for a full refund – which the defendant did not do. *Trujillo*, 2008 U.S. Dist. LEXIS 32128, *11 ("There are two reasons why the Court does not find *Hill* to be dispositive of the present case. First, as was the case in *Bess*, the agreement made it clear to the customer that he could return the product - without penalty as far as this Court can determine from *Hill* - if he did not accept the agreement's terms. *Id.* at 1149. As noted earlier, the record in the present case does not reflect whether or how Trujillo would have known that."). Judge Kennelly also recognized a key distinction with the facts before him, "[b]ut because the plaintiffs [in *Hill*] kept the computer, the court said, they accepted the terms of the agreement, including the arbitration provision." *Id.* at *11-*12. Here, Plaintiff returned the subject product.

In a subsequent opinion, *Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979 (N.D. Ill. 2008), After ripping a declaration submitted by AT&T for lack of personal knowledge of circumstances of the original arbitration motion, *Id.* at 982-86, 987-89, Judge Kennelly denied AT&T's motion to compel:

> What, then, did Trujillo see or have access to before or when he purchased the iPhone? Based on the record now before the Court, at the time he purchased from the Apple store the iPhone that he gave to Dawn Trujillo, Trujillo did not see and did not have access to a paper

12

copy of any documents explaining or referencing ATTM's terms of service, including in particular the arbitration requirement. It has been established beyond peradventure that no such documents were available at the Apple store where Trujillo made the iPhone purchase that forms the basis of his claims[.]

\* \* \*

[T]he Court finds that ATTM has failed to show that the terms of the contract at issue were known or available to Trujillo before he purchased the iPhone at the Apple store. And ATTM has offered no evidence that Trujillo had any involvement in Dawn Trujillo's activation of service on that iPhone or that he had ever seen her terms of service in connection with her prior dealings with ATTM.

\* \* \*

Trujillo did, however, have access to ATTM's terms of service, including the arbitration requirement, when he activated service on the iPhone that Dawn Trujillo gave him as a gift. It is noteworthy, however, that this was several days after he had purchased and, presumably, had given to Dawn Trujillo the iPhone on whose purchase Trujillo bases his claims in this case.

\* \* \*

[T]he unavailability of the ATTM service agreement to Trujillo before he purchased the iPhone is a critical factor in determining the issue of procedural unconscionability. In *Razor*, the Illinois Supreme Court concluded that a warranty containing a disclaimer of consequential damages had not been "made available to the plaintiff at or before the time she signed the sale contract for an automobile, because it was contained in an owner's manual in the automobile's glove compartment, "where it was unavailable to the consumer until after she took delivery." *Id.* Though the court acknowledged that the waiver was in understandable language and was easy to read -- a contention likewise made by ATTM in the present case - - these facts "simply do[ ] not matter," the court said, "if the consumer did not have the opportunity to see the language before entering into the contract to purchase the car." *Id.*] The waiver was ineffective, the court said, because it was not "provided to the purchaser at or before the time that the purchase occurs." *Id.*

[C]ircumstances in the present case buttress the conclusion that the circumstances rendered the arbitration requirement and class action waiver procedurally unconscionable. Trujillo presumably could have declined to click on the "agreement" box when he went online to activate service on the iPhone that Dawn Trujillo had given him. By then, however, he had already purchased the iPhone that he gave Dawn as a gift and upon whose purchase he bases his claims in this case.

\* \* \*

[T]he Court concludes that Trujillo has established, . . . the procedural unconscionability -- and thus the unenforceability -- of ATTM's

> arbitration requirement.
>
> [T]his is a case in which the finding of procedural unconscionability concerns such a basic matter -- the unavailability of the agreement to the consumer at the relevant time.

578 F. Supp. 2d at 889-90, 992-93, 995 (certain citations omitted). Judge Kennelly concluded by holding "[i]t would have been relatively simple for ATTM to make its terms of service actually available in Apple stores[.]" *Id.* at 994-95.

Just like the plaintiff in *Trujillo*, Mr. Rossi was no given access to the subject arbitration clause when he purchased the subject GTD. In contrast to Mr. Trujillo who activated an iPhone via AT&T, Mr. Rossi is merely alleged to have read the terms when activated a rewards program – after he was able open and ingest the GTD product. This is far different (and distinguishable) from activating a several hundred dollar product where the only way to sue the product was to click "accept" and obtain service via AT&T.

### F. GNC Has Failed to Cite to the Entire Arbitration Clause

GNC cites to just a small portion of the terms and conditions (Dkt. 17, p. 5):

> (i) your use of or interaction with the Program, (ii) *any purchases* or other transactions or relationships *with GNC*, or (iii) any data or information you may provide to GNC or that GNC may gather in connection with such use, interaction or transaction.

GNC failed to quote the relevant portions of the arbitration clause.[i] Plaintiff is quoting the entire passage to emphasize the following. First, Plaintiff is underlining certain language to show that the main thrust of GNC's arbitration clause was to require consumers to arbitrate claims related to *the operation of the rewards program* – both the old Gold Card Program and the new myGNC Rewards program. This is supported by the above underlined and italicized language that reads: "[b]y using or interacting with the Program, or engaging in any other GNC Transactions or Relationships with us, you agree to binding arbitration as provided below." Second, GNC fails to explain how the

14

capitalized terms - GNC Transactions or Relationships - support arbitration. It appears that these terms, based upon their placement in relation to clause (iii) of the arbitration language are limited to the arbitration of any misuse of "data or information you may provide to GNC or that GNC may gather in connection with such use, interaction or transaction." It is Black Letter Law than any confusion regarding this term must be construed against GNC, the drafter of the terms and conditions.

Third, the above bolded language demonstrates that the arbitration clause was one-sided. The phrases "we believe", "that you may have with us" and "you will not have the right to pursue a claim in court" are one-sided and demonstrate the absence of a mutual agreement to arbitrate. Nowhere does the arbitration language suggest that GNC is required to arbitrate any claims it may have against a consumer. This lack of mutuality should render the arbitration clause unenforceable because Plaintiff received not tangible benefit other than $5.00 in so called "cash back reward". Dkt. 17-1, ¶3. Fourth, in contrast to the above italicized portion, "[w]e will make every reasonable effort to informally resolve any complaints, disputes, or disagreements that you may have with us", GNC did not live up to its promise that it "will make every reasonable effort to informally resolve any complaints, disputes, or disagreements that you may have with us." Instead, Plaintiff returned to complain about GTD, left his contact information and the subject product, and GNC never reached out to him. FAC, ¶¶12-27.

**VI.  Conclusion**

GNC's argument is predicated on its flawed position that Plaintiff agreed to arbitrate his claims regarding GTD. In reality, weeks after Rossi first purchased GTD, he allegedly signed up for GNC's "myGNC Rewards Program". GNC's attempt to enforce retroactive arbitration clause is unconscionable where Plaintiff almost died from ingesting a product sold by GNC and GNC has failed to cite to any case on point.

Dated: July 27, 2019                     /s/ James C. Vlahakis
                                         Sulaiman Law Group, Ltd.
                                         2500 South Highland Ave., Suite 200
                                         Lombard, Illinois 60148
                                         630-575-8181 Fax: 630-575-8188
                                         Email: jvlahakis@sulaimanlaw.com

**Certificate of Service**

   The undersigned, attorney for Plaintiff, further certifies that on July 27, 2019, he caused the foregoing Motion to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system, which will send notification of such filing to all parties that have appeared in this action.


                   <u>*/s/ James C. Vlahakis*</u>

                   James C. Vlahakis, Esq

---

[i] Here is what the clause says in a more complete quote:

> **We believe** that arbitration is a faster, more convenient and less expensive way to resolve any disputes or disagreements **that you may have with us**. Therefore, pursuant to these T &C, if you have any dispute or disagreement **with us** regarding (i) your use of or interaction with the Program, (ii) any purchases or other transactions or relationships with GNC, or (iii) any data or information you may provide to GNC or that GNC may gather in connection with such use, interaction or transaction (collectively, "GNC Transactions or Relationships"), **you will not have the right to pursue a claim in court**, or have a jury decide the claim and you will not have the right to bring or participate in any class action or similar proceeding in court or in arbitration. <u>*By using or interacting with the Program, or engaging in any other GNC Transactions or Relationships with us, you agree to binding arbitration*</u> as provided below.
>
> *We will make every reasonable effort to informally resolve any complaints, disputes, or disagreements that you may have with us*. If those efforts fail, <u>by using our Program, you agree that any complaint, dispute, or disagreement you may have against GNC, and any claim that GNC may have against you, arising out of, relating to, or connected in any way with these T&C, our Privacy Policy, or any GNC Transactions or Relationships shall be resolved exclusively by final and binding arbitration ("Arbitration")</u> administered by JAMS or its successor ("JAMS") and conducted in accordance with the JAMS Streamlined Arbitration Rules And Procedures in effect at the time the Arbitration is initiated or, if the amount in controversy exceeds $100,000, in accordance with the JAMS Comprehensive Arbitration Rules And Procedures then in effect (respectively, the "Applicable Rules"). The Applicable Rules can be found at

> www.jamsadr.com. If JAMS is no longer in existence, the Arbitration shall be administered by the American Arbitration Association or its successor (the "AAA") instead, and conducted in accordance with the AAA Commercial Arbitration Rules in effect at that time (which shall be the "Applicable Rules" in such circumstances). If JAMS (or, if applicable, AAA) at the time the arbitration is filed has Minimum Standards of Procedural Fairness for Consumer Arbitrations in effect which would be applicable to the matter in dispute, GNC agrees to provide the benefit of such Minimum Standards to you to the extent they are more favorable than the comparable arbitration provisions set forth in this Section, provided, however, that in no event may such Minimum Standards contravene or restrict the application of subpart (e) or (i) below. Furthermore, this Section shall not prevent any party from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

Dkt. 71-1, pp 14-16, PageID #s 177-78 (emphasis supplied).